MARY JEAN PARSONS V. STATE

No. 26,493. November 18, 1953
Rehearing Denied February 10, 1954
Second Motion for Rehearing Denied
(Without Written Opinion) March 10, 1954
Petition for Writ of Certiorari Denied by Supreme Court of the
United States October 14, 1954

388

*O. B. Fisher*, Paris, *Fryer & Milstead*, El Paso, *C. C. Mc-Donald, Bullington, Humphrey, Humphrey & Fillmore, Leslie Humphrey*, Wichita Falls, and *Dan Moody*, Austin, for appellant.

*William E. Clayton*, District Attorney, *Jack N. Fant*, First Assistant District Attorney, El Paso, *George W. Anderson, Jr.*, District Attorney, Wichita Falls, and *Wesley Dice*, State's Attorney, Austin, for the state.

WOODLEY, Judge.

Mary Jean Parsons was indicted in El Paso County for the murder of her husband Richard O. Parsons. She was granted a trial in El Paso County upon the issue of insanity alone, and was found sane both at the time of the homicide on February 16, 1952, and at the time of the preliminary sanity trial on May 27, 1952. Thereafter the venue was changed from El Paso to Wichita County, and on February 11, 1953, a Wichita County jury returned their verdict wherein they found appellant sane at the time of the homicide and at the time of the trial, adjudged her guilty of murder with malice and assessed her punishment at 10 years in the penitentiary.

The statement of facts contains some 1250 pages; the transcript more than 300 pages, and there are 58 bills of exception. Therefore a rather lengthy opinion seems to be justified, if not required.

The record has been carefully read and examined in the light of the well-prepared briefs and arguments of able counsel, both for the state and for the appellant. It is apparent that all of the questions raised cannot be discussed herein, though each has received our careful attention.

Appellant, the daughter of a prominent and respectable family of Tulsa, Oklahoma, was married on January 2, 1952, to the deceased Richard O. Parsons, who had been recently commissioned as a Lieutenant in the United States Army and was under orders to report to Fort Bliss near El Paso.

Following a honeymoon trip to Santa Fe, New Mexico, appellant and the deceased came to El Paso and, after residing for a time in the Royal Arms apartment on Mesa Avenue, moved to Hampton Courts at 1820 Montana Street.

It was established that the homicide occurred on the morning of February 16, 1952, in Apartment No. 2 of the Hampton Court Apartments in El Paso, which appellant and the deceased occupied as their residence, consisting of a living room, bedroom, bath, kitchen and porch.

Appellant remained in and around the apartment during the entire day, and in the afternoon communicated by telephone with her parents in Tulsa, Oklahoma, and advised them she had killed her husband. She was told that counsel would be obtained for her.

Thereafter Mr. W. H. Fryer and his associate Mr. Jack Luscombe, prominent El Paso attorneys, arrived at the apartment and advised appellant that they had been employed to represent her.

Upon their arrival they found appellant in the apartment. The body of the deceased lay on the bed in the bedroom, with two bullet wounds in the head. A .32 caliber pistol was on a chair. The waste basket in the kitchen contained some torn writings of appellant which proved to be important to the state's case. Other letters and papers which were detrimental to appellant's plea of insanity were in the drawer of a desk.

The attorneys looked around the apartment, notified the officers by telephone, and accompanied their client to the El Paso County Jail, advising her against making any statement to the officers regarding the homicide. We commend them and call attention to the fact that there was nothing said or done by Mr. Fryer or his associate which was not within the legitimate scope of their professional employment.

Justice of the Peace Charles Windberg, Jr. arrived at the apartment about 8 or 8:15 P.M., after the appellant had been accompanied to the jail by her attorneys. Thereafter several officers arrived and an investigation was made, including a rather thorough search of the apartment.

Appellant signed a statement in writing in which she confessed that she shot and killed her husband with a pistol which she had purchased a few days before. The testimony offered by appellant in cross-examination of the state's witness also shows that she confessed that she shot and killed her husband.

Appellant pleaded not guilty and filed an application for suspension of sentence, but the sole defense was in fact that of insanity.

We will not attempt to set out the testimony offered in support of appellant's plea of insanity. Suffice it to say that the following facts, certified by the trial judge in some of the bills of exception, are fully supported by the evidence.

"Be it remembered that on the trial of the above entitled and numbered cause the duly qualified medical experts, who had treated and examined the Defendant, testified that on February 16, 1952 she was suffering from a major, malignant, mental disorder known as schizophrenia of the catatonic type; that a catatonic schizophrenic will frequently go into and out of a state of stupor or retardation or loss of contact with environment; that it is a recurrent type of illness; that when having a catatonic attack such a schizophrenic acts impulsively and may become dangerous and homicidal; that on emerging from a catatonic attack, some contact with reality is established and there is memory; that in the opinion of such doctors, *there* the Defendant at the time she pulled the trigger if she did, on the gun that killed Richard O. Parsons, this Defendant did not know the nature, quality, or consequences of such act and that she did not know right from wrong."

. . . . . "The defendant, through counsel, adduced the testimony of three qualified medical doctors who testified that the defendant, Mary Jean Parsons was suffering at the time of the trial from schizophrenia and that she was insane and still suffering from schizophrenia and that she needed medical attention for the treatment of this major, malignant, mental disorder."

In addition to the medical testimony, a number of witnesses who had been acquainted and associated with appellant testified for her and expressed the opinion that she was insane and did not know right from wrong.

Two letters written by appellant to her parents prior to the day of the homicide and referred to as "suicidal notes" were offered in behalf of appellant, one mailed from Santa Fe and another mailed from El Paso on February 1, 1952, at 3 P.M. These letters fully support the conclusion of appellant's witnesses, therefrom, that she was apparently contemplating suicide.

On the other hand a number of witnesses who had seen and observed appellant shortly before and after the homicide were called by the state and testified that they observed nothing to indicate that she was insane, and expressed the opinion that she was sane.

Among the documents introduced by the state, and which were relied upon as indicating sanity, are the following:

The written confession, made the night of the day of the killing, which reads as follows:

"About 8:00 P.M. last evening February 15th, 1952 my husband and I, went to the Apartment of Mr. and Mrs. Tom Fields to play canasta, we played canasta untill about 11:30 P.M. we then went home. Shortly ——— this we got in to an argument about our parents, my husband said my parents had done too much for us in every way, we then started arguing back and forth, I really don't know what it was all about. We then went to bed.

"I awoke about 6:00 A.M. February 16th, 1952, I then went and put the coffee on, I then sat down and smoked a cigarette, all this time thinking about the argument we had been having last night before we went to bed, I then went in to wake Dick up. When he woke up we started arguing again, all I can remember is that he my husband told me to go to hell. I then lost my head compleatly, I then went to the closet in the bed room got my gun, returned to the bed where my husband was laying put the gun to his forehead and pulled the trigger twice. I don't remember any thing very cleary after this for some time. When I did come to my sences about 5:05 P.M. this afternoon I called my mother in Tulsa Oklahoma and told her what I had done. I then told her that I had not called the Police or anty one else, (my mother then told me that she would call my Father, and have him call me back, which he did about fifteen minutes later). My Father then asked me what I had done, and I told him that I had killed my husband, My Father then told me that he would charter a plane and come as soon as possiable, also that he would get me an attorney. My Father then called me back about twenty minutes after this and told me to wait untill my attorney came, before calling the Police, as he d they would make the proper arrangements. About 7:30 P.M. February 16th, 1952 Mr. Fryer and his partner came to my apartment, told me that my brother John B. Fleeger who lives in Tulsa Oklahoma had asked him to repesent me. Mr. Fryer and his partner went to

the bed room looked at the body, then looked around the apartment, Mr. Fryer then asked me to tell him what had happened, which I did. Mr. Fryer then asked me if I needed a sedative and I told him no. Mr. Fryer then went to the phone and called the Sheriff's Dept. He also called the coroner, he then brought me down to the Sheriff's Office, where I was placed in jail.

"After shooting my husband I placed the gun on a chair by the window in the bed room. I bought this gun at the Elpaso Sporting Goods Store, I also bought one box of shells with the gun. My husband was 24 years old and his home was in Pleasantville New York his home was at 12 Hardscrabble Road with his mother and father before he entered the Service. He was stationed at Ft Bliss and was going to start to School thursday.

"My husband and I were married January the 2nd, 1952 in Tulsa, Oklahoma.

"I went to Dipps Grocery store two times to day before I called my mother, the first time I went I bought a pocket mag-izene, the second time I went to the store I bought grocerys.

"The statement I have made to you is the truth to the best of my knowlege.

"William R. Bain
"John E. Tulk                    "Mary Jean Parsons"

The torn notes found in the waste basket in the kitchen, which read:

"I had no grudge against my husband for he was the most wonderful man in the world but he too hated me. I had no intention of doing him any harm just killing myself until I caught him telling people that I was immoral, fattening, and illegal. I had no intentions of marrying him to hurt him but my brother told me it was the right thing to do to get married and move away from my home town. I have always taken people advice and never had a mind of my own. I am a coward, a failure at life and I know that I am going to pay the full penalty. I have worried about it so much that am practically out of my head. I wanted to have a baby, have a happy home life, but for some reason never developed the way normal people do. If I had my life to live over believe me I would never have done any of these wicked deeds."

* * * * * *

"Every time I start to do something good it turns out bad. I hate myself but do not seem to know what I am doing until after it is too late. I wish to God that I had not committed this terrible sin - - after it was"

\* \* \* \* \* \*

"Everytime I start to do something good — it turns out bad. I hate myself but something inside of me always seems to say do the wrong thing. I wish to God now that I had not committed this terrible sin. I guess that its something inside of you that keeps telling you and egging you on to worse and worse sins against Almighty God. I always had a chip on my shoulder against the whole world for all the people who seemed to enjoy life and could laugh, love, for some reason I was not capable of such pleasures. I have wished many many times I had not been born to worry the people who loved me and raised me. My parents address is 2424 East 29 St., Tulsa, Oklahoma.

"Dicks parents address is 12 Hardscrabble Road, Pleasantville, New York."

A number of letters written by appellant to the deceased prior to their marriage were offered by the state. These letters apear to be normal love letters and the witnesses so construed them.

A note to a friend, dated February 14, 1952, was also offered in which we observe nothing to suggest that the writer was mentally deranged.

It is earnestly urged that the verdict finding appellant sane is so against the great weight and preponderance of the evidence as to be clearly wrong, and we should therefore reverse and remand the case.

We confess that we are unable to distinguish this contention from that often urged and which we disposed of in Wenck v. State, 156 Texas Cr. Rep. 50, 238 S.W. 2d 793, in the following language.

"It is urged, however, that the verdict of the jury should be set aside as being contrary to the preponderance and great weight of the testimony.

"We are aware of no decision by this court wherein a reversal solely on this ground has been ordered, though similar contentions have been often urged. See 18 Texas Jur. 464; Griffin v. State, 154 Texas Cr. Rep. 295, 226 S.W. 2d 869; Ross v. State, 153 Texas Cr. Rep., 312, 220 S.W. 2d 137; Cavanar v. State, 99 Texas Cr. R. 446, 269 S.W. 1053; Murray v. State, 147 Texas Cr. R. 474, 182 S.W. 475.

"Every person is presumed to be sane, and to have sufficient judgment and reason to be responsible for his acts until the contrary is established. To discharge appellant from such responsibility, it was necessary that she prove by a preponderance of the evidence that her intellect was so disordered that at the time of the killing, she did not know the nature and quality of the act she was doing, or if she did so know, that she was unable to distinguish between the right and the wrong of the particular act charged, that is, murder. See Ex parte McKenzie, 116 Texas Cr. R. 144, 28 S.W. 2d 133.

"Whether such degree of insanity exists is a question of fact to be determined by the jury. They alone are made the judges of the weight to be given to the testimony of the witnesses and to the opinions expressed by them."

Also in McGee v. State, 155 Texas Cr. Rep. 639, 238 S.W. 2d 707, 709 and 710, we said:

"No necessity exists to state at length the evidence supporting this defensive theory. It is sufficient to say that it is difficult to understand how a stronger defense of insanity could be developed in the trial of a criminal case.

"* * * From a medical standpoint, one may be insane by reason of mental disease or mania, yet, from a legal aspect, not unless or until his mental condition has reached the point where he is unable to distinguish right from wrong and to know the nature and consequences of his acts is he exonerated or excused from crime committed while in that condition. Ross v. State, 153 Texas Cr. R. 312, 220 S.W. 2d 137."

As we view the evidence, the statement first quoted from McGee v. State might well apply here. Yet as in the McGee case, we are not authorized to substitute our judgment, and view of the evidence, for that of the jurors who saw, heard and observed the witnesses.

As presented in the brief of her able and eminent counsel, appellant's first complaint relates to the disposition of her first motion for continuance.

This motion was stricken on motion of the state because it was not sworn to by appellant, but by one of her attorneys.

Art. 545 C.C.P. provides: "All applications for continuance on the part of the defendant must be sworn to by himself."

Appellant urges that it was proper under the circumstances for the attorney to swear to the motion because, as he therein alleged, "the defendant is insane and the facts of this motion are known to him (counsel)."

The presumption that an accused is sane; the fact that a judgment had been entered upon a preliminary trial of that issue that she was not insane, and the finding of the jury in the present trial against the plea of insanity, both at the time of the act charged and at the time of the trial, precludes our consideration of appellant's motion upon the theory that she was insane and therefore need not comply with the statute.

Also we would not be warranted in reversing the conviction because of the striking of the motion unless it would have been error for the court to have overruled the same.

No showing was made that the failure to secure a continuance resulted in injury to appellant. In fact no motion for new trial is found in the record. And it is nowhere shown by affidavit of the absent witnesses, or otherwise, that they would have testified as stated in the motion if they had been present at the trial.

Upon the trial the state introduced the judgment rendered upon the preliminary trial of the issue of sanity, over appellant's objection, among others, that no predicate had been laid as to what evidence was offered or not offered upon which the judgment was returned; that the judgment was not binding "on this Court, this defendant, or this jury or anybody else"; that it was rendered in a preliminary matter not final, not conclusive and not reviewable, and that it "is an invasion of the province of this jury."

If we understand appellant's contentions they are in the alternative as follows: (1) The court should not have admitted the judgment in evidence, or (2) having admitted it, should have

instructed the jury not to consider it for any purpose, or (3) should have instructed the jury that they might only consider the judgment, if at all, as bearing on appellant's sanity on the date of its rendition, or (4) should have limited the jury's consideration of the judgment to the determination of appellant's sanity or insanity at the time of the present trial.

The precise question as to the admissibility of the prior judgment has been settled by former opinions of this court in McMurrey v. State, 145 Texas Cr. Rep. 439, 168 S.W. 2d 858, Boss v. State, 131 Texas Cr. Rep. 574, 101 S.W. 2d 253, Kellum v. State, 91 Texas Cr. Rep. 272, 238 S.W. 940, Earles v. State, 128 Texas Cr. Rep. 663, 84 S.W. 2d 235.

The trial court in his charge limited the jury's consideration of the judgment. Appellant's exception to this charge will be discussed later in the opinion.

There was no error in the admission of the written statement or confession of appellant as testified to by the officers, nor can we agree that the evidence raised the issue of its voluntary nature requiring the submission of such question to the jury.

Here again we cannot accept the conclusion of appellant's counsel that she was insane at the time the confession was signed. The issue was submitted to the jury both at the preliminary trial and here and both juries decided, contrary to appellant's contention, that she was sane at the time of the homicide. There is no evidence to even suggest that she became insane after the homicide and before the statement was signed, on the evening of the same day, and the court properly declined to submit such issue.

Appellant urges that the torn notes found in the waste basket by the officers who investigated the homicide and searched the apartment, the letters written by appellant to the deceased found in desk and dresser drawers, and an album of photographs of the wedding of appellant and the deceased, also found in the apartment, were each and all inadmissible because the search of appellant's home at a time when she was in jail was not authorized by law and was in violation of her constitutional rights.

The precise contention appears to be that although the justice of the peace and the officers assisting in the investigation of the

homicide were lawfully present in the apartment in the discharge of their official duties, they were without authority to conduct a general exploratory search of the apartment, such search not being conducted as an incident to a lawful arrest.

Reliance is had upon United States v. Lefkowitz, 285 U.S. 452, 76 L. Ed. 877, wherein it was held that torn and incriminating documents found in a desk, cabinet and waste basket of the defendant's premises at the time of his arrest upon a valid warrant were inadmissible (though articles found on his person were admissible) upon what is referred to as "the firmly rooted proposition that what are called general exploratory searches throughout premises and personal property are forbidden."

It is argued that here as in the Lefkowitz case, the search could not have been made and the evidence taken even under a search warrant. The legal principle involved is stated in U. S. v. Kirschenblatt, 16 Fed. 2d 202, 203, (cited in the Lefkowitz opinion) as follows:

"Whatever the casuistry of border cases, it is broadly a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him, once you have gained lawful entry, either by means of a search warrant or by his consent. . . ."

We find no difficulty in distinguishing the case now before us and the authorities relied upon. The evidence here in question was obtained by the justice of the peace and the officers who were assisting him in the investigation of the homicide, at the scene thereof, and before the body was removed.

The justice of the peace, acting as coroner, was charged with the duty of obtaining information as to whether death was caused by some criminal act, to obtain evidence to prevent the escape of the guilty, as well as to furnish the foundation for a criminal prosecution in case the death was shown to be felonious. Pierson v. Galveston County, 131 S.W. 2d 27, 13 Am. Jur. p. 108.

The justice of the peace and his assisting officers were not therefore bound by the rule governing the action of an officer lawfully present for the purpose of arresting the occupant of the premises.

On the other hand, it was their duty to conduct the search at the scene of the homicide and to preserve evidence there found

which might show that the death was the result of an unlawful and criminal act. The officers were therefore lawfully present in the discharge of their official duties and the search was not unreasonable or unlawful.

Bills 56 and 58 complain that jurors Lawson and Chase, respectively, were held to be qualified which resulted in appellant being compelled to accept another juror who was objectionable to her.

Venireman Lawson testified on his voir dire that from reading newspaper accounts he had formed an opinion as to the guilt or innocence of appellant which it would take evidence to change. He testified further, however, that he could lay aside what he had read and base his verdict solely on the sworn testimony admitted at the trial, uninfluenced from any other source.

There was no error in the overruling of appellant's challenge for cause to this juror upon the ground of opinion from reading newspaper reports. Myes v. State, 71 Texas Cr. Rep. 594, 160 S.W. 679; Pugh v. State, 148 Texas Cr. Rep. 277, 186 S.W. 2d 258; Art. 616, Sec. 13, C.C.P.

This venireman also was asked by one of appellant's counsel whether, if he decided that she was insane at the time of the act, he would "turn her loose." Objection was made and thereafter the court attempted to explain to the jury that two questions would be asked as to insanity and that "it will take both of those in order to acquit as you say."

We do not think that the prospective juror was subject to challenge because of the statement of the court wherein he used the term "to acquit as you say" instead of "turn her loose" as previously stated by counsel. It is of course true that she would not be "turned loose" except in the event the jury should find that she was sane at the time of the trial and insane at the time of the act. Art. 932(a) V.A.C.C.P.

And Venireman Lawson testified that if chosen he would follow the law that no act done in a state of insanity can be punished, and that if the court so instructed and he decided from a preponderance of the evidence that the defendant was insane he would acquit her.

Venireman Chase, in answer to a question propounded by appellant's counsel, stated that if selected as a juror and he be-

lieved that a defendant was guilty of murder with malice, as charged, he would not believe in a suspended sentence.

The venireman then stated, in answer to question of appellant's counsel, that he would consider the suspension of sentence in such a case if he thought the facts justified a suspended sentence.

The juror further gave this testimony, the question being propounded by appellant's counsel:

"Q. Now do you have any prejudice against the suspended sentence law?" To which the said juror replied:

"A. No, sir, sure don't."

We are unable to agree that the trial court abused his discretion in overruling appellant's challenge for cause to this prospective juror.

Bills of Exception 4, 32 and 54, are addressed to the court's charge limiting the jury's consideration of the judgment on the preliminary trial, the instruction being as follows:

"There has been introduced in evidence before you the verdict of the jury rendered at a previous sanity trial of the Defendant, Mary Jean Parsons, and the judgment entered on said verdict. In this connection you are instructed that you are not to consider this evidence as binding upon you or establishing the fact of the Defendant's sanity at the time the offense is alleged to have been committed, if it was, or at the present time (the time of this trial) but you will only consider said evidence, if at all, as a fact or circumstance relative to the issue of the Defendant's sanity or insanity at such time or times, if it does so, together with all other evidence presented to you on this issue, and for no other purpose."

This instruction was objected to as being a comment on the weight of the evidence; as ineffectually limiting the testimony.

And at the time of the offer of the judgment, without waiving his objection to its introduction, appellant requested that the jury be instructed in regard thereto as follows:

"This judgment may only be considered by you as a circumstance along with other evidence and circumstances before you touching upon the sanity or bearing upon the sanity or insanity

of Mary Jean Parsons as of the date of the rendition of that judgment and no other issue."

Also appellant sought to have the jury instructed to the effect that if they considered the judgment at all, it should be considered only as a circumstance affecting the issue of insanity at the time of this trial, and not on the mental condition of appellant at the time of the killing.

The jury's verdict formed a part of the judgment upon the preliminary trial, and we find no merit in the complaint that the court in his instruction referred to the verdict as having been introduced.

Having concluded that the court did not err in admitting the judgment, we find no error in the charge limiting its consideration. Appellant asked that it be limited, and we are not impressed with the argument that the charge given was on the weight of the evidence in unduly emphasizing this evidence.

In McMurrey v. State, 145 Texas Cr. Rep. 439, 168 S.W. 2d 858, we held that the judgment upon the preliminary trial was admissible. The records of this court disclose that the judgment introduced in that case contained a finding of sanity both at the time of the preliminary trial and at the time of the offense.

We are cited to no rule of law which would require that the evidence, if admissible, should be limited to the issue of present insanity.

We find no reversible error in the court's charge defining malice aforethought and applying the same to the facts.

It was not incumbent upon the court to refer in each paragraph of the charge to the defense of insanity nor to instruct the jury concerning their duty to consider the charge as a whole.

The trial jury was instructed to acquit appellant of murder with malice unless they found beyond a reasonable doubt that the killing was upon malice aforethought, as defined in this charge.

They were then instructed that if they found her not guilty of murder with malice, to next consider whether she was guilty of murder without malice. And following the submission of murder without malice from the state's standpoint, the jury was

instructed that unless they so found and believed beyond a reasonable doubt, to acquit of murder without malice.

Under the provisions of Art. 666 C.C.P. we are not authorized to reverse for what are claimed to be errors in the court's charge submitting insanity at the time of the trial. We are not aware of any evidence in this voluminous record which would support a finding that appellant, if sane at the time of the killing, thereafter became insane prior to the present trial.

The record sustains the conclusion that insanity at the time of the offense was the real issue, and if appellant had been successful in securing a favorable finding upon that issue, she would not have benefited but rather would have suffered by a further finding of present insanity. A verdict of sanity at the time of trial and insanity at the time of the killing would have called for her release, whereas a finding of insanity at both times would have required her to be committed to a state hospital. Art. 932(a) V.A.C.C.P.

A number of bills complain that the court abridged appellant's defense by refusing to affirmatively present the defensive theory to the jury that at the time of the killing appellant was suffering from schizophrenia.

Upon the defense of insanity, the trial court instructed the jury in part as follows:

"* * * to establish a defense on the ground of insanity; it must be proved, not beyond a reasonable doubt, but by preponderance of the evidence, that at the time of committing the act, the party accused was laboring under such defect of reason, from disease of mind, as not to know the nature and quality and consequences of the act she was doing; or if she did know, that she did not know she was doing wrong, . . . that is that she did not know the difference between the right and wrong as to the particular act charged against her. The insanity must have existed at the very time of the commission of the offense, if the same was committed, and the mind must have been so dethroned of reason as to deprive the person accused of a knowledge of the nature and quality and consequences of the particular act done and of the right and wrong as to the particular act done."

To have limited appellant's defense to the particular form of insanity with which her medical experts testified she was afflicted would be to detract from the testimony of non-expert

witnesses, both for the state and the defense, who expressed an opinion on the question of her sanity and knowledge of right and wrong. For such non-expert witnesses could not know or testify that appellant was or was not a schizophrenic.

The court did not err in not including in the submission of the defense of insanity an issue as to whether appellant was a schizophrenic.

Having properly applied the law of insanity by instructing the jury to acquit upon a finding that appellant was insane at the time of the act, it was not error for the court to decline to instruct further that it was not incumbent upon appellant to establish continuous insanity.

Appellant complains that forms were furnished the jury for their verdict, and that among the forms so furnished a verdict of not guilty on the grounds of insanity as suggested in Art. 700 C.C.P. was not included.

We observe that among the forms furnished the jury were the following:

"(8) We the jury find the Defendant not guilty on the grounds of insanity, at the time the act is alleged to have been committed in the indictment but sane at the time of this trial."

"(9) We the jury find the Defendant not guilty on the grounds of insanity at the time the act is alleged to have been committed in the indictment and insane at the time of this trial."

Art. 932(a) V.A.C.C.P. was enacted long after Art. 700 C.C.P., and since its enactment, the forms quoted are appropriate.

Bill No. 30 complains that the trial judge, after having received a report from the foreman of the jury to the effect that they had been unable to agree and indications were that they were hopelessly deadlocked, made the following remarks to the jury after they had been brought into court:

"Now, Gentlemen, I know that you are tired and you have worked a long time, you have been at this a long time, but all of us have a lot invested in this and we would like to get a verdict if we can. I would like to suggest that you go to bed now and

get some rest and work on it some in the morning. How do you feel about that?"

It is shown that at the time of said remarks the jury had deliberated for some eight hours, and reached a verdict more than fifteen hours thereafter. And it is not shown that the trial court inquired or was informed as to how the jury was divided as to number.

We cannot attribute to the remarks the construction that the trial judge was referring to financial investments or that the jury so construed the same.

The remarks of the trial judge do not call for reversal.

Finding no reversible error, the judgment is affirmed.

ON MOTION FOR REHEARING

MORRISON, Judge.

This court has been favored by five briefs representing the efforts of as many eminent and outstanding law firms from all sections of the state. We express our gratitude for the help which these fine lawyers, as well as the attorneys representing the state, have afforded us.

We shall attempt to discuss the contentions in the order presented.

In discussing the court's refusal to consider the motion for continuance, we first wish to disclaim any intention of holding in our original opinion, as appellant now claims we did, that an insane accused is deprived of the right to make an application for continuance. We do not think our opinion is susceptible of such interpretation.

Nor do we agree that this court is without jurisdiction to evaluate the merits of the motion for continuance because the trial court did not rule on its merits. Such an interpretation of our jurisdiction would lead to absurdities. If a trial court rules correctly but for an incorrect reason, we nevertheless support his ruling for the simple reason that the appellant has not been injured.

The Supreme Court of the United States, in Helvering v. Gowran, 302 U.S. 238, 82 L. Ed. 224, expressed the same rule in this manner:

"In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason."

When one complains of the failure of the trial court to grant continuance, it becomes incumbent upon him to show, both in the trial court and here, that he has been injured by such ruling. Such a showing is made by establishing with some degree of reliability that the missing witness would have testified to something material and beneficial to the accused. No affidavits of the missing witnesses were attached to the motion for continuance in the case at bar. This is not a prerequisite to a valid motion, but having failed to so attach them at that stage of the trial, it became incumbent upon an accused, who wishes to rely upon the alleged error of the court, to file a motion for new trial and there make his showing just as is required in cases involving jury misconduct. Without satisfactory proof to the contrary, the trial court might reasonably conclude that the witnesses would not have so testified. A mere recitation that the appellant expects to prove certain things by the witnesses is not sufficient.

In Morris v. State, 158 Texas Cr. Rep. 516, 251 S.W. 2d 731 (writ of certiorari denied 73 S. Ct. 863, 345 U.S. 951, 97 L. Ed. 1374), in discussing a motion for new trial, we said:

"The motion should have had the affidavit of the missing witness or a showing, under oath, from some other source that the witness would have actually testified to such facts."

Since the appellant filed no motion for new trial in this case, she merely waived an opportunity to show injury if she could, and no such showing is in the record before us; therefore, a reversal is not called for on this point.

We now approach the task of discussing the legality of the search of the appellant's home and appellant's contention that our original opinion has deprived her of the privileges, immunities and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

Though we do not decide the question of the search on the basis of invitation or consent, we think it is reasonably inferable from the record that appellant's attorney, acting for her, called the officers and advised them that a homicide had occurred and that the corpse might be found in the appellant's apartment. It was in response to this call that the justice of the peace, acting in his capacity as a coroner, arrived at the apartment, and the search followed. We conclude that the coroner was lawfully there, and it became his duty under the law to view the body and ascertain the cause of death. Appellant would have us make a distinction between evidence relating to the cause of death and evidence relating to appellant's sanity. We do not think such a distinction exists, because both became issues in a trial growing out of the homicide. An analogy to this case may be found in the opinion of the Supreme Court of this State in Polk County v. Phillips, 51 S.W. 323. In that case a man had been shot by the constable. This was undisputed. The sole question sought to be ascertained by the justice of the peace was the direction in which the bullet passed through the body. That question became important in determining if the homicide was culpable. In the opinion by the illustrous Chief Justice Gaines, the Court said that the justice of the peace was authorized to order the autopsy for the purpose stated. In that case, the constable was asserting the affirmative defense of self-defense, and the court held that the justice of the peace had the authority to search out information which might substantiate or refute such defense. In the case at bar, the appellant asserted the affirmative defense of insanity. By the same token, we think that the justice of the peace was authorized to search out information to substantiate or refute such defense.

Our holding is not predicated solely upon the presence of the justice of the peace. We think there is a clear distinction between the right to search predicated upon a lawful arrest or a search warrant and one predicated upon the presence of a dead body. In the latter case, it becomes the duty of one and all lawfully present to ascertain, if they can, how and by whom death was caused and any facts that would tend to show whether the homicide was unlawful or excusable.

Appellant urges us to re-examine the holding of the Supreme Court of the United States in Lefkowitz v. U.S., supra. We observe only that this was a review of trial held in a Federal court. We are impressed with the latitude accorded state court trials concerning questions of search and seizure as demonstrated by the relatively recent opinion of that court in Salsburg v. Mary-

land, 346 U.S. 545, 74 Supreme Court Rep. 280, 98 L. Ed._____ We observe that the search in this case was nothing like as intensive as that upheld in Harris v. U.S., 331 U.S. 145, 91 L. Ed. 1399.

Appellant again asserts that the trial court should have submitted to the jury the issue as to the voluntary nature of the confession. Appellant confessed within thirty minutes after the officers began to question her. The only testimony relative to this questioning came from the officers themselves, and they testified that she freely and voluntarily admitted shooting her husband. The police account of the confession is undenied. "Mere detention and police examination in private of one in official state custody do not render involuntary the statements or confessions made by the person so detained." Brown v. Allen, 344 U.S. 443, 97 L. Ed. 469, at p 499. A trial court is never called upon to submit such an issue unless it is raised by the evidence.

As stated originally, the sole issue was that of appellant's sanity.

Remaining convinced that we properly disposed of this cause originally, appellant's motion for rehearing is overruled.