Mark Milton MOORE, Appellant,

v.

The STATE of Texas, Appellee.

No. 51801.

Court of Criminal Appeals of Texas.

Oct. 6, 1976.

---

James P. Finstron, Dallas, court appointed, for appellant.

Henry Wade, Dist. Atty., Steve Wilensky, John Ovard, Robert Whaley and Donald J. Driscoll, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder wherein the punishment was assessed at death.

On the night of November 13, 1973, Martha Janette Williams, a secretary for Fantastic Photo on West Mockingbird Lane in Dallas, was working alone in the office. The appellant, a janitor at the building, picked up Curtis Lee Jones at 11 p. m. and went to the building. When he entered the office where Williams was, she appeared startled and the appellant left. Later, appellant and Jones discussed robbing "the girl in the office" and returned and apparently took money from the petty cash box. Appellant told Jones that Williams had recognized him and they had to take her with them. Jones was ordered to put Williams in the trunk of her car, and he drove that car to the Trinity River bottoms. Appellant followed in another car. After an unsuccessful attempt to sink the car, the appellant shot the deceased with a .410 shotgun.

The autopsy showed four gunshot wounds, including one to the chest at the area of the heart and one to the right side of her face, destroying it. Bruises about her face were consistent with being struck repeatedly with a fist or the butt end of a gun.

Officer William Huggins of the Dallas Police Department found the car and the body while on patrol the next day. Six spent shotgun shells were recovered in the vicinity of the car.

While no positive determination could be made, there were indications of rape, such as the finding of semen on the floor of the office, the vaginal smear taken from the deceased, and the open zipper on the deceased's jeans.

Initially appellant complains the court erred in conducting part of the voir dire examination of potential jurors in violation of Article 35.20, Vernon's Ann.C.C.P., which provides they shall be called in the order in which they appear on the jury list furnished the defendant.

This is what appears to have occurred. There was no special venire. The jury panel for the case was brought to the courtroom from the central jury room, where the

jurors had been part of the jury panel for the week.

After their arrival in the courtroom, the trial judge explained to them the nature of the case, the estimated time the court would take to try the case and explained certain principles of law applicable to the case as permitted by Article 35.17, Vernon's Ann.C.C.P.

Although supposedly the potential jurors had been qualified as members of the jury panel for the week, the trial judge asked for "excuses" after his explanation of the case and principles applicable thereto. The veniremen were instructed to come to the bench one at a time. Those offering "excuses" did not appear in the order their names appeared on the jury list.

We, however, do not find that the appellant objected to these veniremen appearing out of order to present their "excuses." No error is shown. *Dent v. State,* 504 S.W.2d 455 (Tex.Cr.App.1974).

■ It should be remembered that the conduct of the voir dire examination must rest largely within the sound discretion of the trial court. *Weaver v. State,* 476 S.W.2d 326 (Tex.Cr.App.1972); *Abron v. State,* 523 S.W.2d 405 (Tex.Cr.App.1975).

It is observed that after the "excuses" were passed upon the voir dire examination of the veniremen took place individually and apart from the rest of the panel.

Appellant also urges the trial court erred when it denied appellant individual voir dire examination of each prospective juror apart from the rest of the panel as required by Article 35.17, Vernon's Ann.C.C.P.

■ Appellant had filed a demand that he be accorded such examination, and it had been granted by the court. It appears that appellant's complaint is directed to the action of the court in hearing "excuses" while

the balance of the panel was still in the courtroom.

It appears the few prospective jurors involved approached the bench one at a time, and there is no showing that the balance of the panel heard the interrogation at the bench.[1] One of the purposes of authorizing separate examination of each individual juror in absence of the panel is to permit the asking of questions which might prejudice the entire panel. Under the circumstances, appellant has not shown how he has been harmed by the procedure utilized for hearing the "excuses" of some 18 prospective jurors where it was not shown the balance of the panel heard the interrogation.

■ In another ground of error appellant complains of the court's action in excusing several jurors without challenge by the State or defense. We have examined the four instances cited[2] and do find that the trial court did excuse the prospective jurors without challenge. The court should not have excused the prospective jurors without challenge except upon grounds which showed an absolute disqualification. See Article 35.19, Vernon's Ann.C.C.P.; *Ernster v. State,* 165 Tex.Cr.R. 422, 308 S.W.2d 33 (1957); *Henriksen v. State,* 500 S.W.2d 491 (Tex.Cr.App.1973). While it is inconceivable the State would not have challenged each of the prospective jurors for cause, such challenge could have been waived. See Article 35.16, Vernon's Ann.C.C.P. Nevertheless, we have examined the voir dire examination of each of the prospective jurors and do not find that the appellant objected on the ground now urged on appeal—that there was no challenge for cause. The objections offered were to the grounds upon which the prospective jurors were excused. No error is presented.

■ The record before us further shows that three of the four prospective jurors

1. It is observed that at one point defense counsel inquired if the prospective juror had heard the questions propounded to the previous prospective juror and he answered, "No, sir."

2. In his original brief appellant complained of 18 prospective jurors being excused without

challenge. Some of these were excused without objection by the appellant. See *Parker v. State,* 457 S.W.2d 638 (Tex.Cr.App.1970). In a supplemental brief the number was pared to six and then pared to four in oral argument by appellant's counsel.

were not willing to consider the full range of punishment in the event appellant was found guilty. The appellant was not entitled to have these three on the jury. See Article 35.16(b)3, Vernon's Ann.C.C.P. Furthermore, the appellant has not shown that he was tried by a jury to which he had a legitimate objection. See *Henriksen v. State*, supra.

Appellant complains the court erred in sustaining the State's challenge for cause to prospective juror Hill because none of the reasons for challenge for cause listed in Article 35.16, supra, were shown to be applicable.

Marada Hill first approached the bench when the court asked for "excuses." She related she had no husband, had children 17 and 14 years of age, and was not paid when she was not at work, that she could not keep her mind on the case as she would be worrying how to pay her bills, etc., since her employment was her only source of income. Upon objection, she was not excused but interrogated again several days later during individual voir dire examination. Again she stated that her situation had been affecting her the last few days and had put a strain on her and that all she could think about was how she was going to pay her bills, etc. She didn't think she could be a very fair juror. She was challenged and excused over the objection of the appellant.

■ Article 35.16(a), supra, provides that, "(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. . . ." The statute is divided into three parts, providing challenges for cause which both the State and the defense *may* make, those which the State *may* make and those which the defense *may* make. We find nothing in the statute which renders these lists an exclusive basis for challenges for cause. Challenges for cause not based on any ground mentioned in the statutes are ordinarily addressed to the sound discretion of the trial judge. See and cf. *Texas Power and Light Company v. Adams*, 404 S.W.2d 930

(Tex.Civ.App., Tyler 1966—no writ); *City of Hawkins v. E. B. Germany and Sons*, 425 S.W.2d 23 (Tex.Civ.App., Tyler 1968, writ ref., n. r. e.).

■ Any juror who is going to be so preoccupied by personal problems so that she could not be fair certainly is "incapable or unfit to serve on the jury." We find no abuse of discretion in the court excusing Mrs. Hill.

In two grounds of error appellant urges the trial court erred in failing to sustain challenges for cause to two prospective jurors when it was developed on voir dire that their addresses were different than their addresses on the jury list furnished the appellant. He cites *Swofford v. State*, 3 Tex.App. 76 (1877), and *Thompson v. State*, 19 Tex.App. 593 (1885), for the proposition that if the *name* of the prospective juror varies from that on the jury list given to the defendant the juror should be set aside.

■ In the instant case there was no variance as to the name and no claim the prospective jurors were not in fact the jurors summoned for duty. It appears the prospective jurors in question had previously lived at the address on the jury list and had recently moved to another address in Dallas County. The variance in address is not a challenge for cause under Article 35.-16, supra, nor can we see how such a variance as to address alone renders a juror incapable or unfit to serve on a jury when there is no question he was the juror summoned for duty and the new address does not render the juror disqualified as to residence.

■ Appellant also urges the trial court erred in excusing upon challenge prospective juror Friedman for bias of the potential juror against the minimum punishment for murder since such bias does not fall within the reasons for challenges for cause provided the State in Article 35.16, supra.

The prosecutor explained to the prospective juror that if the State failed to prove capital murder (alleged to have occurred in November, 1973), then there was the lesser included offense of murder, which carried a

penalty of not less than two years nor more than life imprisonment. At some length the prospective juror expressed her bias at the two years or minimum punishment and could not understand legislators enacting such punishment for murder.

While Article 35.16(b), supra, provides that the State is the only party that may challenge for cause when a juror has conscientious scruples in regard to the infliction of the death penalty, there is no corresponding provision provided that defense is the only party who can challenge where a juror opposes the minimum punishment. In fact, Subsection (b)(3) provides that the State may challenge if the prospective juror "has a bias or prejudice against *any phase of the law* upon which the State is entitled to rely for conviction *or punishment.*" It was upon this provision of the statute that the court expressly relied in sustaining the State's challenge. While it is difficult to see why the State would challenge the prospective juror on the basis stated, we cannot conclude that error is reflected. The fact that appellant expressly waived any objection to the juror because of her bias against the minimum would not call for a different result.

For the same reasons we find no error in the excusing of the prospective jurors Barge, Pate and Cuddy, who were challenged for cause by the State on the same basis.

Appellant contends the trial court erred in overruling his challenge for cause to prospective juror Larsen and in refusing to grant any additional peremptory challenges to appellant in connection with the examination of said prospective juror.

██ The last prospective juror interrogated and last juror chosen was one Oscar V. Larsen. It is doubtful that the appellant properly challenged this juror for cause. Near the conclusion of the interrogation appellant's counsel merely stated, "We'll submit the juror" and the court responded,

"Overruled." There was nothing else to indicate a challenge for cause and no fact alleged or stated which would render the juror incapable or unfit to serve. It is also evident from the record that the court was not sure of appellant's meaning of "We'll submit the juror." At the conclusion of the interrogation of the prospective juror immediately preceding Larsen the record reflects:

"MR. FINSTROM: We'll submit the juror.

"THE COURT: You may step down.

"MR. WHALEY: Judge, what do you mean submit?

"THE COURT: Overruled. What do you mean submit?

"MR. FINSTROM: We will pass the witness then." [3]

If it can be argued that the same was a challenge for cause, we note the appellant did not call to the trial court's attention any of the four grounds for such challenge now urged on appeal.

Larsen testified he had some friends in the law enforcement field, a neighbor and a cousin in Detroit, Michigan. He related he also had a close friend who was shot in the line of duty, but he testified that none of the facts would affect his ability to sit as a juror in the instant case. There was nothing to show bias or prejudice by this interrogation.

██ Further voir dire examination reflects that Larsen vaguely remembered some newspaper accounts of the offense approximately seven months previously. He vaguely recalled an apprehension, but did not recall any janitors being arrested. He related he would take the testimony from the witness stand, that he didn't know many facts, although there was a possibility something "might ring a bell" during the trial. This interrogation was abandoned and was not pursued in accordance with Article 35.16(a)(9), supra. We find nothing

---

**3.** It may well be a Dallas County custom or practice to use such phraseology as meaning a challenge for cause, and it is observed the trial judge was a visiting judge serving by virtue of an administrative assignment. If there is such a custom, the appellate record should so reflect.

to show that appellant was subject to challenge for cause on this ground. See and cf. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

■ Appellant also urges Larsen was disqualified because he would not hold to his view if opposed unanimously by the other eleven jurors. This is not exactly what Larsen testified. He stated he might have some problems because he was a nervous person, but he didn't think it would affect his vote, "but you never know until it happens." In *Orange v. State*, 76 Tex.Cr.R. 194, 173 S.W. 297 (1915), it was held that a prospective juror who, in answer to the question whether, after hearing the evidence and being of the opinion that the defendant should be acquitted, the fact that the other 11 jurors were for conviction would or might cause him to change his opinion and lead him to an agreement, answered, "I don't know; I cannot say; I am afraid and believe it might" was not subject to challenge for cause.

■ Appellant also urges Larsen was subject to challenge because he had a bias or prejudice against probation in a murder case. Larsen testified several times he could give due consideration to the full range of punishment, including probation, though it had no real meaning for him as a possible penalty in a murder case, that it would be a rare case where it would be applicable, but he would follow the law. The record does not show Larsen was disqualified and subject to challenge. See *Parsons v. State*, 160 Tex.Cr.R. 387, 271 S.W.2d 643 (1954), cert. denied, 348 U.S. 837, 75 S.Ct. 36, 99 L.Ed. 660 (1954). Appel-

lant was not forced to take an objectionable juror.

If an additional peremptory challenge was requested after the "challenge" to Larsen was overruled, appellant has not directed our attention to where in the record such request is reflected, and we have found none. We do note that the trial court did give the appellant three additional peremptory challenges during the voir dire examination.

Appellant urges that nine prospective jurors were excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Hovila v. State*, 532 S.W.2d 293 (Tex. Cr.App.1976), we held that the holding of *Witherspoon*[4] was still alive and well in light of the new statutory scheme providing for the imposition of the death penalty, the adoption of which followed in the wake of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The new statutory scheme for capital murder [V.T.C.A., Penal Code, Section 19.03 (formerly Art. 1257, Vernon's Ann.P.C., as amended in 1973) and Article 37.071, Vernon's Ann.C.C.P.], including the possible infliction of the death penalty, has been upheld by this court in *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), and by the United States Supreme Court in *Jurek v. Texas*, —— U.S. ——, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See also *Gregg v. Georgia*, —— U.S. ——, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

With this background we turn to the examination of the prospective jurors complained of.

4. In *Witherspoon* the Supreme Court of the United States wrote:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." The Court further wrote:

"Unless a venireman states unambiguously that he would automatically vote against the

imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

Further explanation was made in *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), when the Court wrote:

"[i]t is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case."

■ Prospective jurors Sanders, Ritter and Clark did not believe in and were against the death penalty and would not vote for the death penalty under any circumstances. Ritter added he had been of that opinion for 30 years and was not going to change his mind. The excusing of these prospective jurors squares with *Witherspoon*.

■ Prospective jurors Costly and Laird expressed strong opposition to the death penalty and testified that their feelings were such that if chosen they would refuse to participate in answering the questions or issues submitted to them as provided by Article 37.071, Vernon's Ann.C.C.P. Prospective juror Reeb also expressed strong opposition to the death penalty and stated her opposition would affect her deliberations upon the issues submitted to her.

V.T.C.A., Penal Code, Section 12.31(b), provides:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact." [5]

It is clear that Costly, Laird and Reeb were properly excused under this State statutory provision without the necessity of consideration of whether their answers also disqualified them under the *Witherspoon* doctrine.

Prospective juror Bradford stated her opposition to the death penalty and then vacillated as to whether she could consider it as proper punishment in some cases. However, she consistently stated that her opposition to the death penalty would affect her deliberations on the fact issues submitted to her. Prospective juror Wheeler, after much confusion over the questions asked, stated clearly that the death penalty would affect her deliberations upon the issues. Likewise, after a lengthy interrogation, prospective juror Kearby, who expressed opposition to the death penalty, concluded her feelings so expressed would affect her deliberations on the issues to be submitted.

While it might be argued as to whether the answers of these three prospective jurors would have disqualified them under the holding in *Witherspoon*, nevertheless their answers were such as to disqualify them under said Section 12.31(b), supra, quoted above, without the necessity of considering the *Witherspoon* question.

Appellant's contention is overruled.

■ Appellant complains the court erred in admitting a fingerprint comparison into evidence based on fingerprints taken from the automobile used in the offense and taken at the scene and on fingerprints taken from him after a warrantless arrest without probable cause.

Dallas Police Officer G. F. Rose testified that appellant and two other men who were thought to be working in the building (where the abduction occurred) on the night in question were asked to go to the police station and give statements about their hours of work. They were placed in separate rooms. Appellant was asked to give his fingerprints and agreed to do so. He was not placed under arrest until sometime later when the fingerprint comparison was made. Reliance is had upon *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), where the court held inadmissible fingerprint evidence taken from Davis, who with other individuals was detained without probable cause as a result of "dragnet" procedures. In that case, the Court stated:

"The State makes no claim that petitioner voluntarily accompanied the police officers to headquarters . . . and willingly submitted to fingerprinting. . . ."

The facts of the instant case do not show the "wholesale intrusion upon the personal

---

**5.** See similar provision contained in Article 1257(d), Vernon's Ann.P.C., 1925, as amended (Acts 1973, 63rd Leg., p. 1122, ch. 426—effective June 14, 1973 until January 1, 1974—effective date of present Penal Code).

security of our citizenry" which was roundly condemned in *Davis v. Mississippi*, supra. Here, the appellant voluntarily agreed to go to the police station and, while there, voluntarily gave his fingerprints. No error is presented.

In a related complaint appellant argues that his confession given (after his fingerprints were matched to those found on the victim's automobile) was improperly obtained.

 It appears appellant was asked and voluntarily agreed to go to the police station at about 12:30 p. m. on November 16, 1973. He permitted his fingerprints to be taken about 1:30 p. m. Apparently about 2 p. m. it was learned that his prints matched those on the victim's automobile. At this point appellant's complicity in the homicide became likely. Appellant was later given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Article 38.22, Vernon's Ann. C.C.P. At 9 p. m. he gave the confession in question. The facts here mirror those in *Jones v. State*, 522 S.W.2d 470 (Tex.Cr.App. 1975), and we cannot conclude that the confession was rendered inadmissible as a result of illegal detention.

 It is true that appellant was not taken before a magistrate prior to the time his confession was taken. Delay, however, in being taken before a magistrate does not render a confession involuntary unless there is a causal connection between the delay and the taking of the statement. See *Short v. State*, 511 S.W.2d 288 (Tex.Cr.App.1974); *Shadrick v. State*, 491 S.W.2d 681 (Tex.Cr. App.1973); *Spencer v. State*, 489 S.W.2d 594 (Tex.Cr.App.1973).

Appellant advances the contention the conviction for capital murder cannot stand because the evidence wholly fails to show that the murder was committed in the course of a robbery as alleged in the indictment.

Omitting the formal parts, the indictment alleged in part that the appellant did "then and there unlawfully voluntarily and with malice aforethought kill Martha Janette Williams by shooting her with a gun, the said Mark Milton Moore and Curtis Lee Jones, acting together, then and there intentionally *committed said murder in the course of committing and attempting to commit robbery* upon Martha Janette Williams." (Emphasis Supplied.)

Appellant's confession was the narration of events upon which the State principally relied to support the theory of the robbery or attempted robbery. Omitting the formal parts of the confession, it reads:

"Last Tuesday night I dropped Curtis Jones off at his job and got to work about 5:00. I worked at my job at 1010 Mockingbird until about 6:00 P.M., when I left and Clarence left with me. I helped my girlfriend's sister move. I had a .410 gauge shotgun under the trunk of my car. It was an old rusty thing. I went by and picked Curtis Jones up about 11:00 and went back over to 1010 Mockingbird and I opened the door and went into the building. I saw a girl in an office. I went into her office because I saw a light on. The girl acted scared and I said I was sorry. Me and Curtis left and went to a little Club on King Street. We left there and went back to 1010 Mockingbird. On the way back we was talking about robbing the girl in the office. When we got there Curtis got the .410 shotgun out of the trunk. He had a stocking over his face. We went in and the girl screamed. We asked her for her money but she said she didn't have any. I told Curtis she had seen me and would know who I was. I told Curtis that I would finish my work, then we would take her with us. I finished up my work and put everything away. I went back to the office and told Curtis to bring her out. I turned out the lights so nobody would see us. I told Curtis to put her under the trunk of her car and he did. Then he drove her car, it was a little red Dart with a black vinyl top. Curtis drove ahead of me and I followed him. We went down under the bridge at the Trinity River over Highway 183. When we got there we tried to drive it off into the water. Curtis put it into drive and it

went off the bank into the water, but would not go down. Curtis said it won't go down, we are going to have to shoot her. Curtis opened the trunk lid and I shot her about twice with the bolt action .410 shotgun and one of us closed the lid and we left and went straight home. We got home about 2:00 in the morning."

It must be remembered that the offense in question occurred on November 13, 1973, while Article 1257, as amended in 1973, was in effect. The amendment was effective from June 14, 1973, through December 31, 1973, when the statute became V.T.C.A., Penal Code, Section 19.03. The applicable statute, adopted following in the wake of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), provided in part that the punishment for murder shall be death or imprisonment if:

" * * *

"(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson . . . ." (Acts 1973, 63rd Leg., p. 1122, ch. 426)

The State argues that under the broader definition of robbery in the new Penal Code the murder in the instant case was clearly "in the course of robbery." What the State

overlooks is the fact that the offense occurred on November 13, 1973, prior to the effective date of the new Penal Code (January 1, 1974),[6] although the indictment was returned and trial was had after the effective date of the new Penal Code. Section 6.01(a) [Saving Provisions] of the bill enacting the new Penal Code provides in part:

"(a) Except as provided in Subsections (b) and (c) of this section, this Act applies only to offenses committed on or after its effective date, and a criminal action for an offense committed before this Act's effective date is governed by the law existing before the effective date, which law is continued in effect for this purpose, as if this Act were not in force. . . ."

Therefore, we must appraise appellant's contention in light of Article 1257, as amended in 1973 (quoted in part above), and Article 1408, Vernon's Ann.P.C., 1925, defining robbery under the former Penal Code.[7]

Appellant takes the position that the robbery took place at the Fantastic Photo office on Mockingbird Lane and that the murder took place some distance away near the Trinity River bottoms and, therefore, the murder did not take place during the course of the robbery as contemplated by Article 1257, supra.

---

**6.** If the new Penal Code had been in effect, the State would be correct.

V.T.C.A., Penal Code, Section 29.02 (Robbery), provides in part:
"(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with intent to obtain or maintain control of the property, he:
"(1) intentionally, knowingly, or recklessly causes bodily injury to another; or
"(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. . . ."
V.T.C.A., Penal Code, Section 29.01 (Definitions—Chapter 29—Robbery), provides in part:
"In this chapter:
"(1) 'In the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft. . . ."
In *Lightner v. State*, 535 S.W.2d 176 (Tex.Cr. App.1976), and *Brown v. State*, 535 S.W.2d 640

(Tex.Cr.App.1976), it was held under said Sections 29.01 and 29.02 the assault involved can take place after the theft and it can still be robbery, unlike the former Code (Article 1408, Vernon's Ann.P.C., 1925), where the assault or violence, etc., had to be antecedent to the taking of the property.

**7.** Article 1408, supra, provides:
"If any person by assault, or violence, or by putting in fear of life or bodily injury, shall fraudulently take from the person or possession of another any property with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary for life, or for a term of not less than five years; and when a firearm or other deadly weapon is used or exhibited in the commission of the offense, the punishment shall be death or by confinement in the penitentiary for any term not less than five years."

Appellant relies upon *Lamberson v. State*, 509 S.W.2d 328 (Tex.Cr.App.1974). There, the deceased was beaten and robbed at a house and left abandoned some distance away near a creek after having been beaten again at the creek by the defendant and his companion, who returned to the house. In about ten minutes the defendant returned to the creek and beat the deceased severely again. Two days later, the deceased was found lying face down in the creek. The cause of death was drowning. The defendant raised the question of double jeopardy and contended the trial court erred in permitting him to be tried for murder since he had been previously convicted for robbery by assault growing out of the same transaction. This court disagreed, holding that the robbery had terminated at the house with the taking of the deceased's money and that the subsequent beatings near the creek occurred within a 30 minute period without a continuous assaultive action tying the two crimes together.

First we observe that *Lamberson* involved a question of double jeopardy, which is not here presented, and that assaultive action here was continuous. Further, while the term "course" has many meanings, we observe that Webster's New International Dictionary of the English Language, Second Edition, Unabridged, defines "course" as:

"5. A series of motions or acts arranged in order; a succession of acts or practices; as, a *course* of conduct."

■ In using the phrase "in the course of committing or attempting to commit . . . robbery . . . ." in Article 1257, supra, we cannot subscribe to the Legislature an intent to provide for capital murder under Article 1257, supra, only where the killing takes place at the same place and about the same time of the robbery and to permit a defendant who has committed a robbery to escape capital murder charges where he removes the robbery victim from the scene and takes him or her to another place and there kills the victim to prevent the victim's testimony.

"The court will not adopt a construction that will make a statute absurd or ridiculous, or one that will lead to absurd conclusions or consequences; if the language of the enactment is susceptible of any other meaning." 53 Tex.Jur.2d, Sec. 165, p. 243.

Appellant's contention is overruled.

Appellant further complains that the trial court improperly defined "in the course of a robbery" in its charge to the jury at the guilt stage of the trial to mean conduct that occurs "in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of a robbery" because the phrase "in the course of a robbery" has a common and easily understood meaning and the definition placed an undue emphasis on it and constituted a comment on the weight of the evidence.

■ Article 36.14, Vernon's Ann.C.C.P., provides that a defendant may present his written objections to the court's charge "distinctly specifying each ground of objection." The appellant here objected merely and simply on the basis that the court had "improperly" defined "in the course of robbery." He did not bring to the attention of the trial court the objections he now urges on appeal, and we find no special requested charges on this matter. There was no compliance with Article 36.14, supra. We cannot conclude under all the circumstances present that the error, if any, was calculated to injure the rights of the appellant or deprive him of a fair and impartial trial. See Article 36.19, Vernon's Ann.C.C.P.

■ Appellant also complains that two psychiatrists were permitted to give testimony at the punishment stage of the trial relating to one of the three issues that may be submitted to the jury under the provisions of Article 37.071, Vernon's Ann.C.C.P. —whether a probability exists that a defendant would commit criminal acts of violence which would constitute a continuing threat to society.

Article 37.071, supra, is dispositive of this ground of error. It provides in part in Subsection (a):

"Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented *as to any matter that the court deems relevant to sentence.* This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. . . ." (Emphasis Supplied.)

Obviously the court deemed the testimony relevant as it was in *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976). The language of the statute is thus dispositive of appellant's contention. *Duke v. State,* 61 Tex.Cr.R. 441, 134 S.W. 705 (1911), and *Gephart v. State,* 157 Tex.Cr.R. 14, 249 S.W.2d 612 (1952), relied upon by appellant, were decided long prior to the adoption of the present statutory scheme for capital murder. Reliance thereon is misplaced. In *Duke* the expert was asked if the defendant was a fit subject for excessive punishment, such as death or long confinement. The court refused to permit an answer. It was upheld on appeal since it is not the province of an expert to give his opinion as to how a party accused of crime is to be punished. In the instant case the psychiatrists gave opinion testimony relating to one of the issues to be submitted to the jury at the penalty stage of the trial, but they were not asked what proper punishment should be assessed. Appellant cites *Gephart* for the proposition that the only legitimate testimony in the form of expert psychiatric opinion which is admissible in a criminal trial is on the issue of insanity. In light of the statute and the nature of the second issue to be submitted under Article 37.071, supra, we cannot agree with such limitation.

▮ Appellant also submits the contention that the evidence at the penalty stage of the trial was insufficient to show that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. See Article 37.071, Vernon's Ann.C.C.P.

Dr. John E. Holbrook testified he examined the appellant and found him to be a sociopath of the anti-social type who was not mentally insane but who had no respect for anyone else's property or life. He expressed the opinion that the probability was very great that appellant would commit further acts of violence and he showed no remorse for the instant offense. Dr. Charles Grigson's testimony was to the same effect, that the appellant was a severe sociopath who was extremely dangerous and who had no regard for the life or property of another and would continue to present an absolute threat to whatever society he was involved in. Dr. Grigson testified that there was no known cure for appellant's condition.

This testimony, taken together with that offered at the guilt stage of the trial, was sufficient to sustain the jury's answer of "Yes" to the second issue submitted at the penalty stage of the trial.

Appellant further complains that the prosecutor argued outside the record during the punishment stage of the trial and the court erred in failing to grant a mistrial.

The argument complained of was:

"He [appellant] told Dr. Holbrook, you heard from the testimony, if he is given the chance to commit acts of that nature, of a violent nature, he will continue to do so."

▮ Appellant's objection thereto was sustained and the jury was instructed to disregard the argument, but the mistrial motion was overruled. Both psychiatrists testified that in their opinion appellant would commit acts of violence in the future if given the opportunity, but neither revealed any statement to that effect made by the appellant. Therefore, the argument was outside the record, but a reading of the record reflects that the prosecutor was incorrectly summarizing the testimony rather than giving unsworn testimony. Under the

circumstances, we find the prompt instruction to disregard was curative. The motion for mistrial was properly denied. *Thomas v. State*, 519 S.W.2d 430 (Tex.Cr.App.1975); *Morgan v. State*, 502 S.W.2d 695 (Tex.Cr.App.1973); *White v. State*, 492 S.W.2d 488 (Tex.Cr.App.1973); *Lenzi v. State*, 456 S.W.2d 99 (Tex.Cr.App.1970); *Shelton v. State*, 367 S.W.2d 867 (Tex.Cr.App.1963).

The judgment is affirmed.

ODOM, J., concurs in the result.

ROBERTS, Judge (dissenting).

In this case the appellant timely and properly contended in his brief filed in the trial court that the evidence was insufficient to support an affirmative answer to the second special issue submitted at the punishment stage of this capital murder trial. See *Livingston v. State*, 542 S.W.2d 655, p. 663 (Tex.Cr.App.1976) (opinion of Roberts, J.), delivered this day.

I would sustain this contention and reverse, for two reasons: First, the evidence that the murder in fact took place in the course of a robbery is extremely weak. *Lamberson v. State*, 509 S.W.2d 328 (Tex.Cr.App.1974).[1] Second, the psychiatric testimony is not sufficient to support an affirmative answer to the second special issue, for the reasons stated in part III of my dissenting opinion in *Livingston v. State*, supra.

The judgment should be reversed.

---

1. I also believe that *Lamberson* requires a finding that this murder did *not* take place in the course of a robbery, and I would so hold.