

# NUMBER 13-22-00367-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**CARLOS GABRIEL CHUMACERO,**                                       **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                **Appellee.**

### On appeal from the 36th District Court
### of San Patricio County, Texas.

# OPINION

**Before Chief Justice Contreras and Justices Silva and Peña**
**Opinion by Chief Justice Contreras**

This case concerns a June 23, 2019 shooting which resulted in the death of sixteen-year-old Gavin McFarland and injury to his father John "Gabe" McFarland. Appellant Carlos Gabriel Chumacero was convicted of four offenses arising out of the incident: murder, a first-degree felony, *see* TEX. PENAL CODE ANN. § 19.02(c); aggravated assault with a deadly weapon, a second-degree felony, *see id.* § 22.02(a)(2); unlawful

possession of a firearm by a felon, a third-degree felony, *see id.* § 46.04(e); and tampering with physical evidence, a third-degree felony. *See id.* § 37.09(c). Chumacero was sentenced to concurrent prison terms of sixty, twenty, ten, and ten years for the respective offenses.

On appeal, Chumacero argues the trial court erred by: (1) "applying the wrong standard" in denying his pre-trial motions to transfer venue; and (2) denying his motions to suppress a video-recorded confession without determining whether it was made voluntarily. We affirm.

I. BACKGROUND

A. Pre-Trial Motions

Chumacero was indicted on June 9, 2020. On September 15, 2020, he filed a "Motion for Change of Venue" arguing that "there is so great a prejudice against [him] in San Patricio County . . . that a fair and impartial trial cannot be obtained." The motion noted that Gavin McFarland was a well-known student-athlete at Sinton High School; that the local elementary school held a vigil in his honor; that "[t]he Sinton community held a blood drive" in his memory; that Gavin's mother was a teacher at a school in the county; and that the shooting was covered extensively by the local news media.[1] Chumacero later supplemented the motion with affidavits by two San Patricio County residents who stated they observed the media coverage of Gavin's death and opined that Chumacero would not be able to receive a fair trial in that county. The State filed a response to the motion which included two counter-affidavits.

---

[1] The motion observed that, as of 2017, the population of San Patricio County was 67,215, and the population of Sinton was 5,617.

On April 19, 2021, Chumacero filed a motion to suppress a video-recorded confession he had made to Henry Roland Gonzales Jr., his associate who was also suspected in the shooting. The motion to suppress argued that Chumacero made the statement in response to "force and threat[s]" by Gonzales and another associate, Marco Palacios; that he was intoxicated when he made the statement; and that he was not given the warnings required by the code of criminal procedure before making the statement. Chumacero argued the recording should be suppressed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, §§ 10 and 19 of the Texas constitution; and § 38.22 of the Texas Code of Criminal Procedure.

Chumacero later filed a second motion to suppress which included an affidavit in which he stated that Gonzales and Palacios threatened to kill his girlfriend and his family if he did not take the blame for the shooting. He averred that he did not shoot Gavin or Gabe and that, but for the threats, he would not have made the false confession. The second motion to suppress further argued that the recording of the confession should be suppressed under Texas Code of Criminal Procedure article 38.23 because it was obtained illegally by Gonzales.[2]

On July 2, 2021, a new attorney for Chumacero filed a "Motion to Transfer Venue" repeating the arguments made in the earlier motion and asking for the case to be transferred to Nueces County. The motion argued that "[t]he media coverage" of Gavin's death was "intense" and "massive," and therefore "it will be impossible" for Chumacero to get a fair trial in San Patricio County. On December 17, 2021, Chumacero filed an

---

[2] Specifically, the second motion to suppress argued that Gonzales obtained the statement by committing the penal offense of terroristic threat. *See* TEX. PENAL CODE ANN. § 22.07.

amended motion to transfer including two additional affidavits detailing some of the media coverage and opining that a fair trial is not attainable in the county. The new affidavits specifically pointed to a July 5, 2019 article in the *Corpus Christi Caller-Times* which mentioned Chumacero's video-recorded confession to Gonzales.[3] The amended motion also noted that, in a television news interview following the shooting, San Patricio County Sheriff Oscar Rivera stated that "the Sheriff's department is working very hard because the McFarland family is a very important family in San Patricio County."

The State filed a response to the amended motion to change venue arguing in part that "the Jury should be empaneled and voir dire should take place as this will be the ultimate deciding factor to show that the Defendant will be able to have a jury selected that will be unbiased to hear the evidence in this case." The response further stated: "The hearing for the Amended Motion To Transfer Venue should be heard after the jury selection as the State contests the Defendant's affidavits in support of [his] motion."

## B.    Pre-Trial Hearings

The trial court heard arguments on the motions to suppress at a hearing on April 27, 2021. Defense counsel argued that Chumacero's video-recorded statement was inadmissible under article 38.22 of the code of criminal procedure because he was not administered *Miranda*-type warnings before making the statement. The State observed that no law enforcement officer was involved in the acquisition of Chumacero's statement, and it argued that statement is therefore "not suppressible" by statute or constitution. The

---

[3] Alexandria Rodriguez, *Document: 3 witnesses in truck identify suspect in Sinton teen's death*, CORPUS CHRISTI CALLER-TIMES (July 5, 2019), https://www.caller.com/story/news/crime/2019/07/05/document-3-witnesses-truck-id-man-who-fatally-shot-sinton-teen/1643754001 (stating that, according to arrest affidavits, "Henry Gonzales provided a video of Carlos Gabriel Chumacero admitting shooting Gavin McFarland and John 'Gabe' McFarland").

4

trial court denied the motions to suppress but advised defense counsel that "if you have something new to argue, you may certainly file another motion."

The motions to suppress were argued again at a subsequent hearing before a visiting judge on August 16, 2021. At this hearing, defense counsel acknowledged that Gonzales, as a private citizen, did not have a duty to administer *Miranda*-type warnings before taking Chumacero's statement; however, she argued that the statement should still be suppressed because it was obtained by coercion and threats and was not voluntarily made. Chumacero testified through an interpreter that Gonzales called him two or three days after the shooting and told him to come outside and get in a car. According to Chumacero, Gonzales and another man in the car instructed him to make a statement on video that he shot the McFarlands, and the men threatened to kill Chumacero and his family if he did not do so. Chumacero said he believed the threats because on the night of June 23, 2019, he saw Gonzales with a gun in his hand immediately after the McFarlands were shot. He also said he saw Gonzales kick Gavin in the head after the shooting. Chumacero testified that the confession he made in the video recording was false, and that he would not have made the statement if Gonzales had not threatened to kill him and his family.

On cross-examination, Chumacero acknowledged that his current attorney was the fourth attorney he had since the inception of the case,[4] but he did not tell his previous three lawyers that Gonzales had coerced him into making the video-recorded confession. The State again argued that, because there was no law enforcement officer or other

---

[4] Defense counsel explained that Chumacero's first attorney stopped working on the case because he died in June of 2019, and his second attorney stopped working on the case because he "got very, very sick."

government agent involved in the acquisition of the statement, it may not be suppressed. The trial court denied the motions to suppress.

The trial court heard arguments on the motions to change venue at a hearing on May 18, 2022. At that hearing, the defense offered into evidence eleven video recordings of news reports from Corpus Christi television stations discussing the June 23, 2019 shooting and its aftermath. Rivera testified that he and several deputy sheriffs provided security for the vigil that was held at the elementary school. Rivera agreed that "the whole town was there" and "everyone rallied around the McFarland family." He acknowledged that he gave interviews to three Corpus Christi television stations, and he agreed that "anyone who watches TV or is on YouTube or Facebook would have seen the coverage"; however, he stated that is a "common occurrence in every case." He said he knew the McFarland family but did not know Gavin or Gabe "personally." On cross-examination, Rivera explained that there had previously been two other high-profile murder cases in San Patricio County with "a lot more publicity than this one," and the trials in those cases went forward "without a problem." Rivera conceded that this case "was a very, very, hot topic in Sinton" around the time it happened but "if you reach out to [other San Patricio County cities] Aransas Pass, Ingleside, Portland, Gregory, Odem, Taft, Mathis, they have no clue." Rivera also stated that he has not been contacted by any news media regarding this case since July of 2019. He denied that the McFarlands "ha[ve] several relatives involved with the court system" in San Patricio County, and he opined that Chumacero "could have a fair trial in this county, without a doubt."

At the close of the hearing, the State noted that a "significant portion" of the news reports and articles at issue did not mention Chumacero's name, and it argued that those

6

which did were "objective and reasonable." Defense counsel argued that, nevertheless, the coverage "had the effect of getting people to bond with Gavin McFarland" and "to want justice for him." The State then observed that voir dire was scheduled for the following week, and it asked the trial court to "delay this determination until we find out whether we can pick a jury on Monday." The State opined that Chumacero was seeking an immediate ruling on the transfer motion as part of a "delay strategy" because such ruling could be appealed or subject to a petition for writ of mandamus. Defense counsel denied that she was seeking a continuance and replied: "We don't mind waiting until Monday."

> The trial court stated:
>
> All right. Very good. Let's do this. As I indicated in an e-mail some time ago, my local custom and practice that I always follow—I'm happy to let you put on whatever you want to put on, on the Motion to Transfer, but I'm never going to rule on the Motion to Transfer. It will be carried along with the jury selection to see whether or not we can get a jury. If we can't get a jury, then either on your motion or on my own motion, I will reconsider the Motion to Transfer.

Defense counsel then stated: "I remember the Court saying that, Your Honor. We agree. We just wanted to make sure that we had a hearing on the issue."

## C. Voir Dire, Trial, and Verdict

Voir dire took place on May 23, 2022, and approximately 150 venire members were examined. In response to defense counsel's questions, five venire members said they knew about the case or knew witnesses, and three venire members said they knew the McFarlands, but each averred that they could be fair in this case. One venire member stated she did not think she would be a good juror because the case involved the death of a child. Another venire member stated that he donated money to a scholarship fund in Gavin's name. The venire members unanimously denied having attended the funeral, vigil, or blood drive. Overall, nine challenges for cause were granted by the trial court,

each party exercised their peremptory strikes, and a jury was selected. At the beginning of proceedings on May 24, the trial court stated that "we were able to impanel and swear a jury, so the motion to transfer venue or change of venue motion is denied."

Trial testimony established that, shortly after midnight on Sunday, June 23, 2019, Gavin was driving his truck in rural St. Paul, north of Sinton, with Gabe as a passenger. The McFarlands had been at the local VFW Post, where Gabe was drinking alcohol. At some point, another truck passed the McFarlands and nearly collided with them, and Gavin pursued the other truck for a few miles. Eventually, the leading truck stopped in front of Audrey Ocampo's residence, and the occupants of the vehicles emerged and began fighting.

Gabe testified that, as he engaged in a fight with the driver, he heard gunshots. Gavin suffered fatal gunshot wounds to the left shoulder and left side of the chest, and Gabe was shot twice in the leg. Gabe said neither he nor Gavin were armed at the time. When Gabe was released from the hospital after the shooting, he told police that one of the people in the truck ahead of Gavin was an "average height, heavy-set" man.[5] Because Gonzales met that description, police sought a warrant for Gonzales's arrest.

Palacios testified he was driving the truck which passed the McFarlands. He said he had a handgun in the truck at the time of the incident, but it was not there the next day, and he assumed it had been stolen. Palacios denied handling or using his gun during the altercation on June 23, 2019, and he did not know who fired the gunshots at the McFarlands. He acknowledged he was intoxicated at the time.

Ocampo, Gonzales's then-girlfriend, testified that Palacios drove her and

---

[5] At trial, Gabe could not identify the shooter.

Gonzales to get beer while Chumacero stayed at her house. As the group returned to her house, they passed a truck, and the truck began following them. When Palacios stopped in front of her house, she saw "two men running up to [Palacios's] truck" and "attacking," so she ran into her house. Ocampo later heard someone say, "I shot him in the lung," but she was unsure whether it was Palacios or Chumacero. She acknowledged that she told police it was Chumacero who said that. Ocampo also conceded that she told police shortly after the shooting that Palacios said he "got rid of the gun."

Gonzales testified that, as he exited the passenger side of Palacios's truck, he heard gunshots, and when he looked to his left, he saw a gun in Chumacero's hand. According to Gonzales, Chumacero later told him, "If you say anything, you know what it is"; Gonzales said he understood this as a threat. Gonzales testified that he went to the police station for questioning two or three days after the shooting, and after he was released, he went to Chumacero's residence and recorded Chumacero's confession with his cell phone. He later emailed the recording to an investigator. When the recording was offered into evidence during a police officer's testimony, defense counsel stated she had "[n]o objection," and it was played for the jury. In the fifty-eight-second recording, Chumacero states:

> This is Carlos Chumacero. Saturday, one in the morning, I was the shooter. There was a—my friends went out to get gas at the store, came back, they parked and behind them, there was a truck. They just got down and started fighting. He started coming towards me, so I got scared. I went inside the truck and—cause I already saw something was down there, I didn't know what it was—then I just realized it was a pistol and started shooting. I got scared, jumped inside the truck and told my friend, "Hey, if you don't take me home, I'm going to shoot you too." I apologize to those families I've hurt, to those individuals I've hurt. I didn't mean—I didn't mean all this to happen.

Chumacero testified at trial that he was running out of Ocampo's house when he heard the shots fired. He said he fell into a ditch and broke his glasses and, when he got

9

up, he saw Gonzales holding a gun. He then got into Palacios's truck and the group departed. As to the video-recorded confession, Chumacero testified consistently with his testimony at the second pre-trial suppression hearing.

The jury found Chumacero guilty on all four counts as charged in the indictment, and the trial court sentenced him as set forth above.[6] This appeal followed.

## II.     DISCUSSION

### A.     Venue

Chumacero argues by his first issue that the trial court erred "by applying the wrong standard" in denying his motion to transfer. Specifically, he complains that the court improperly refused to rule on the motion until after voir dire, regardless of what occurred at the pre-trial hearing on the motion. We construe this issue as challenging the trial court's pre-trial denial of his motions to change venue.

#### 1.     Standard of Review

We review the trial court's ruling on a motion for change of venue for abuse of discretion. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). If the trial court's decision falls within the zone of reasonable disagreement, it will be upheld. *Id.* And the decision will be affirmed if it is correct on any theory of law applicable to the case. *See Romero v. State*, 800 S.W.2d 539, 543–44 (Tex. Crim. App. 1990); *Calloway v. State*,

---

[6] The live indictment alleged that Chumacero was a habitual felony offender for purposes of punishment enhancement. *See* TEX. PENAL CODE ANN. § 12.42(d). At sentencing, Chumacero pleaded true to the enhancement allegations, and the court found them true. We observe that, in light of the statutory punishment enhancement, the sentences of twenty and ten years are below the applicable punishment range according to the penal code. *See id.* (providing generally that, "if it is shown on the trial of a felony offense other than a state jail felony punishable under [§] 12.35(a) that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years").

743 S.W.2d 645, 652 (Tex. Crim. App. 1988); *Parsons v. State*, 271 S.W.2d 643, 655 (Tex. Crim. App. 1953) ("In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." (quoting *Helvering v. Gowran*, 302 U.S. 238, 245 (1937))).

Chumacero contends that his first issue is one of statutory construction, and therefore should be reviewed de novo. *See Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008) (noting that statutory interpretation is a question of law and is reviewed de novo on appeal). It is true that a trial court "has no discretion in determining what the law is or applying the law to the facts." *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004) (Holcomb, J., dissenting) ("As to the determination of controlling legal principles, an abuse of discretion occurs if the trial court clearly fails to analyze or apply the law correctly. . . . Thus, a failure by a trial court to analyze or apply the law correctly will constitute an abuse of discretion." (footnotes omitted)). Thus, to the extent the trial court's decision was based on interpretation of a statute, we will afford no deference to that decision. However, the overall ruling on whether to transfer venue will be reviewed for abuse of discretion, in accordance with the case law. *See Gonzalez*, 222 S.W.3d at 449.

### 2. Applicable Law

"For an accused to receive a fair trial consistent with due process of law, the jury must determine his guilt or innocence on the basis of the evidence admitted at trial and not on the basis of other facts or allegations appearing in the media." *Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992). "Sometimes, however, situations arise in which pretrial publicity is so pervasive and prejudicial as to create a reasonable probability

11

that an impartial jury cannot be empaneled even with the most careful voir dire. In such situations, a change of venue is compelled by the Fourteenth Amendment's due process clause." *Id.* (citing *Rideau v. Louisiana*, 373 U.S. 723 (1963)); *see* U.S. CONST. amend. XIV. Relatedly, the Texas Code of Criminal Procedure provides that a trial court may grant a motion to change venue when "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 31.03(a)(1); *see* TEX. CONST. art. III, § 45 ("The power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law[.]").

"Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial." *Henley v. State*, 576 S.W.2d 66, 71 (Tex. Crim. App. 1978); *see Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996) ("Even if it were possible to select a jury whose members were not challengeable for cause, appellant was entitled to a change of venue if he could show that there were community influences which could affect the answers on voir dire or the testimony of witnesses at trial, or that for any other reason a fair and impartial trial could not be had in [the county in which the charges were brought]."). Relevant factors in "determining whether outside influences affecting the community climate of opinion as to a defendant are inherently suspect" include:

> (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or

12

individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.

*Henley*, 576 S.W.2d at 71–72.

To obtain a change of venue based on great prejudice, the defendant "bears a heavy burden to prove the existence of such prejudice in the community[] that the likelihood of obtaining a fair and impartial trial jury is doubtful." *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006); *DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990). For the denial of the motion to constitute an abuse of discretion, "publicity about the case must be pervasive, prejudicial[,] and inflammatory." *Beets v. State*, 767 S.W.2d 711, 743 (Tex. Crim. App. 1987). The defendant must demonstrate "an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Tracy v. State*, 597 S.W.3d 502, 509 (Tex. Crim. App. 2020) (citing *DeBlanc*, 799 S.W.2d at 704). "Merely because a case has been publicized in the media does not automatically give rise to a presumption of prejudice so as to necessitate a change of venue; due process does not require that jurors be completely ignorant of the facts of the case." *Narvaiz*, 840 S.W.2d at 428.

### 3. Analysis

Among other cases, Chumacero cites *Henley v. State*, in which the Texas Court of Criminal Appeals held that it was reversible error for the trial court to deny a motion to change venue without holding a hearing prior to voir dire. *See Henley*, 576 S.W.2d at 70. In that case, the trial court "predicated its denial of appellant's motion solely upon the successful qualification of a jury panel." *Id.* The court of criminal appeals held that "[i]n so doing the court confused the grounds for change of venue with the grounds for juror challenge for cause." *Id.* Quoting a nineteenth-century case, the Court explained how and

why the two inquiries differ:

> [T]he jury is obtained and impaneled under [the] rules of law, and the law providing for [a] change of venue proceeds upon the hypothesis that the prejudice may be so great and universal in the county as that improper jurors may be obtained, notwithstanding every test may be applied to them. If there were no danger of obtaining prejudiced jurors on the panel, then the law providing for a change of venue upon this ground has no foundation in reason. If obnoxious jurors could be detected and kept from the panel by the question[s] provided for in the Code, then there would be no reason for a change of venue. But . . . the law providing for the change proceeds upon the assumption that, notwithstanding all tests are made, there may be such a prejudice in the county as will render it probable that an impartial juror might serve.

*Id.* at 71 (quoting *Meyers v. State*, 46 S.W. 817, 818 (Tex. Crim. App. 1898)); *see Faulkner v. State*, 65 S.W. 1093, 1095 (Tex. Crim. App. 1901) ("Prejudice is a sinister quality. It may possess a man and he not be aware of it; or, being aware of it, he may purposely conceal it, in order that he may vent his revenge. In according a change of venue our statutes wisely provide against that prejudice which may creep into the jury box.").

Since *Henley*, however, the Texas Court of Criminal Appeals has held that it is "permissible for the trial court to hold its ruling on the motion [to change venue] in abeyance until after voir dire [is] completed" and "for the trial court to convene the hearing on venue after a jury [has] been selected." *Foster v. State*, 779 S.W.2d 845, 854–55 (Tex. Crim. App. 1989) (observing that, "[a]fter voir dire, the trial court would have had the benefit of jury selection to help gauge the community attitudes and opinions toward appellant"); *see Bell*, 938 S.W.2d at 46 (stating that "[t]he trial court may use voir dire to help gauge the community climate" in deciding a motion to change venue). *But see Silva v. State*, 64 S.W.3d 430, 433 (Tex. App.—San Antonio 2001, no pet.) ("[W]hen an issue as to the propriety of venue is raised under articles 31.03 and 31.04, . . . it is to be resolved only after a pretrial evidentiary hearing. The failure to do so is error.").

Here, the trial court held a pre-trial hearing on the motion for transfer, as required by law. However, it stated at the conclusion of the hearing that its "local custom and practice" is to "never" rule on a venue motion until after the parties have had the opportunity to select a jury; and only if "we can't get a jury" would the court "reconsider" the motion. Chumacero contends that "[t]he judge can change his mind after hearing the voir dire, but he cannot simply refuse to rule." Even assuming the truth of that general proposition, it is not clear that the trial court actually "refuse[d] to rule" after the pre-trial hearing in this case. The court stated that it was "never going to rule" on the motion and would "carr[y it] with" jury selection, but it also said it would "reconsider" the venue motion after voir dire, which implies that the motion had in fact been at least implicitly denied. *See* TEX. CODE CRIM. PROC. ANN. art. 28.01 (providing that "motions for change of venue, if overruled at the pre-trial hearing, may be renewed by the State or the defendant during the voir dire examination of the jury"); *see also* TEX. R. APP. P. 33.1(a)(2) (stating that, for an alleged error to be preserved on appeal, the trial court must have "ruled on the request, objection, or motion, either expressly or implicitly").

Even if we were to conclude that the trial court erred by refusing to rule on the transfer motion before voir dire, the error would not be reversible because Chumacero's defense counsel unequivocally expressed her agreement to the trial court's approach at the end of the pre-trial hearing. *See* TEX. R. APP. P. 33.1; *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental. . . . In other words, a party is estopped from seeking appellate relief based on error that it induced.").

Chumacero further argues that, because of the trial court's "custom and practice," he was deprived of a "fair hearing" on his motion because "[p]ersuasive venue facts would not be considered until the judge found out if he could pick a jury." We disagree that Chumacero was deprived of a fair hearing on the venue motion. Again, even assuming the trial court made no ruling on the motion until after voir dire took place, that does not mean the court did not consider the evidence and arguments offered at the pre-voir-dire hearing when ultimately making its decision.

In any event, Chumacero has not established that he was harmed by the purported error in failing to rule. *See* TEX. R. APP. P. 44.2(b). In the context of motions to change venue, a trial court's pre-voir-dire refusal to rule is functionally indistinguishable from a denial—either way, voir dire will proceed in the same court, and the defense will have the opportunity to re-urge its motion at that point. *See* TEX. CODE CRIM. PROC. ANN. art. 28.01; *Bell*, 938 S.W.2d at 46. And on this record, we cannot conclude that the trial court would have abused its discretion if it had explicitly denied the motion following the pre-trial hearing. The affidavits and other evidence submitted by Chumacero indicate that the McFarland family is well-known and well-liked in San Patricio County, that the shooting commanded substantial contemporaneous media attention, and that the county has a relatively small population. Chumacero's affiants believed that a fair trial could not be had in the county for those reasons.[7] However, the State produced counter-affidavits in which other San Patricio County residents stated that they had not seen news coverage of the

---

[7] One affiant stated that "I am not the kind of person who believes the police make mistakes so I would tend to want to convict [Chumacero] simply because he is charged with the crime of murder." That may establish the affiant's personal prejudice and unfitness for jury service, but it does not indicate that such a prejudice existed in the community at large.

16

case and did not know the parties involved.[8] Moreover, the trial court heard Rivera's testimony that, though the case was a "very, very[] hot topic in Sinton" at around the time the shooting, it was not in other county communities, and the notoriety of the case had dissipated in the years since the shooting occurred.

We have reviewed the video recordings of news broadcasts and publications submitted as evidence, and we cannot say they satisfy Chumacero's "heavy burden" to show "prejudice in the community" such that "the likelihood of obtaining a fair and impartial trial jury is doubtful." *See Renteria*, 206 S.W.3d at 709; *DeBlanc*, 799 S.W.2d at 704. The news coverage largely centered on the community's response to Gavin's death, including the vigil and blood drive, but it did not do so in an inflammatory or provocative manner. To the extent the coverage specifically mentioned Chumacero, it reported objective facts—i.e., that he was arrested and charged in connection with the shooting, and that police were in possession of a recorded confession that he made. In one television interview, Rivera stated that "[i]t was a privilege to be able to tell [the McFarland family] before the body was buried, that the offender was in custody." Aside from that remark, the news reports described Chumacero as a suspect or an accused, not as an "offender." The evidence fell short of demonstrating "an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Tracy*, 597 S.W.3d at 509. Accordingly, even if the trial court explicitly denied the motion to change venue at the conclusion of the pre-trial hearing, such ruling would not constitute

---

[8] We observe that two of the affidavits submitted by the State were not favorable to its argument. In one affidavit, a San Patricio County resident stated that Chumacero's common-law wife "was present when he was placed under arrest" and therefore "would be b[iased]" in favor of the State. Another affiant stated that she believed venue should not be changed because "anyone that has broken the law and knows they [have] broken it, or will break it, should be liable for their actions" and "consequences have to be paid."

17

an abuse of discretion.[9]

For the foregoing reasons, Chumacero's first issue on appeal is overruled.

## B.    Voluntariness of Confession

Chumacero contends by his second issue that "[t]he trial judges failed to rule on the voluntariness of a statement of an accused as is required by 38.22, [§] 6" of the Texas Code of Criminal Procedure. He argues "[t]he judges did not consider the voluntariness of the statement because it was not taken by law enforcement." We construe this issue as challenging the denial of his motions to suppress the confession recorded on video by Gonzales.

### 1.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to the trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013). The trial judge is the sole judge of witness credibility and the weight to be given to witness testimony. *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). Second, we review de novo the trial court's application of the law to the facts. *Valtierra*, 310 S.W.3d at 447.

"As a general rule, appellate courts view the evidence in the light most favorable

---

[9] Chumacero argues that a review of voir dire and trial proceedings bolsters his argument that a fair trial was unattainable in San Patricio County. He notes that, at one point, a juror was excused for hugging a witness. We disagree that voir dire and trial proceedings showed that a fair trial was unattainable. As noted, out of approximately 150 venire members, fewer than ten stated that they knew about the case or knew the McFarlands or any of the witnesses. Nine venire members were challenged for cause, and the jury was selected without difficulty or any further complaint by defense counsel.

to the trial judge's ruling, regardless of whether the judge granted or denied the suppression motion." *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) (footnote omitted). "Thus, courts afford the prevailing party 'the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.'" *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). The ruling will be upheld if it is supported by the record and correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

### 2. Applicable Law

Article 38.23 of the Texas Code of Criminal Procedure provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused" in a criminal trial. TEX. CODE CRIM. PROC. ANN. art. 38.23. Under this statute, a statement made by a defendant may be inadmissible if it was not freely and voluntarily made. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008); *see* TEX. CODE CRIM. PROC. ANN. art. 38.21 ("A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed."). When the voluntariness of a statement is at issue, the State has the burden to "prove by a preponderance of the evidence that the statement was voluntary." *Vasquez v. State*, 411 S.W.3d 918, 920 n.11 (Tex. Crim. App. 2013).

> A defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona*[, 384 U.S. 436 (1966),] as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. It may be involuntary under one, two, or all three theories. A statement that is

"involuntary" as a matter of constitutional law is also "involuntary" under Article 38.22, but the converse need not be true.

*Oursbourn*, 259 S.W.3d at 169 (noting that "the first step in deciding upon an appropriate jury instruction is identifying the theory of involuntariness").

Sections 2 and 3 of article 38.22 apply only to statements made "as a result of custodial interrogation." *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (providing that a "written statement made by an accused as a result of custodial interrogation" is admissible only if the accused is administered *Miranda*-type warnings prior to making the statement); *id.* art. 38.22, § 3(a) (providing that an "oral or sign language statement of an accused made as a result of custodial interrogation" must comply with same warning requirements as a written statement and must also be electronically recorded). Further, when a complaint of involuntariness is made under the Due Process Clause or *Miranda*, the statement will be excluded "only when there is police overreaching." *Oursbourn*, 259 S.W.3d at 169. That is because "'[t]he Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting people from themselves or other private actors," and "[a]bsent police misconduct causally related to the confession, there is 'simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.'" *Id*. at 170 (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). Accordingly, claims of voluntariness based on the Due Process Clause and *Miranda* "do not require 'sweeping inquiries into the state of mind of a criminal defendant who has confessed.' They involve an objective assessment of police behavior." *Id*. at 171 (quoting *Connelly*, 479 U.S. at 167).

On the other hand, § 6 of article 38.22 "literally applies to 'all cases where a question is raised as to the voluntariness of a statement of an accused.'" *Oursbourn*, 259

20

S.W.3d at 171 n.36 (quoting *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999)). While article 38.22 as a whole is "aimed at protecting suspects from police overreaching," § 6 of that article "may also be construed as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement. Period." *Id.* at 172. Accordingly, "[c]laims of involuntariness under Article 38.22 can be, but need not be, predicated on police overreaching, and they could involve the 'sweeping inquiries into the state of mind of a criminal defendant who has confessed' found in *Connelly* that are not of themselves relevant to due process claims." *Id.* at 172.

"A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary under Article 38.21 and the Texas confession statute." *Id.* "This has long been the case in Texas." *Id.* at 172 n.40 (citing *Cain v. State*, 18 Tex. 387, 389–90 (1857) ("Before confessions can be received in evidence in a criminal case, it must be shown that they were voluntary. They must not have been obtained by the influence of hope or fear, applied by a third person to the prisoner's mind.")).

Section 6 of article 38.22 states:

*In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause.* Such order shall not be exhibited to the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the

jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling and order stating its findings.

*Id.* art. 38.22, § 6 (emphasis added).

In holding that "police overreaching" need not be shown to establish involuntariness under § 6, the *Oursbourn* Court specifically observed that "a private threat" may render a confession involuntary under that statute. *Oursbourn*, 259 S.W.3d at 172; *see Davis v. State*, 313 S.W.3d 317, 337 (Tex. Crim. App. 2010). The Court did not explicitly state that § 6 applies to a confession obtained without any involvement whatsoever by a State agent, such as the one at issue here. That said, there is nothing in the statute or in *Oursbourn* attaching any legal significance to the difference between statements given to State agents and statements given to other people. Instead, as noted, § 6 applies "[i]n *all cases* where a question is raised as to the voluntariness of a statement of an accused." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (emphasis added). Under § 6, "the focus is upon whether the defendant voluntarily made the statement. Period." *Oursbourn*, 259 S.W.3d at 172. The *Oursbourn* Court explicitly held that § 6 applies to "non-custodial" statements made by an accused, which includes the statement at issue here. *See id.* (noting that § 6 "applies to both an accused's custodial *and* non-custodial statements because it provides that only 'voluntary' statements may be admitted").

The State cites no authority, and we find none, limiting the application of § 6 to statements given to law enforcement or other State agents. We conclude that § 6 applies

22

here, notwithstanding the lack of law enforcement involvement in the acquisition of the confession, because "a question [wa]s raised" as to the voluntariness of the statement. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 172; *Cain*, 18 Tex. at 389–90.

### 3. Hearings

At the first suppression hearing on April 27, 2021, defense counsel argued only that the recorded confession was inadmissible because Chumacero was not administered the warnings required by §§ 2 and 3 of article 38.22. The trial court did not hear any evidence but summarily denied the motions to suppress without stating its reasoning. The court explicitly stated that defense counsel could "file another motion" if she had "something new to argue." No further motion to suppress was filed, but at the second suppression hearing on August 16, 2021, defense counsel argued that Chumacero's confession was inadmissible because it was the product of coercion and illegal conduct by Gonzales. After Chumacero testified to that effect, defense counsel offered two other video recordings into evidence.[10] At that point, the trial court stated:

> I will take that as a proffer on the motion to suppress, but once again we've already discussed the fact that the motion to suppress is based on duress or coercion, and those may be excellent matters to discuss at trial, but I'm not so sure they're very relevant on the motion to suppress as the D.A. has been objecting to.

The court then asked for argument from both parties. Defense counsel contended that the recording was inadmissible under article 38.23 because it was "obtained illegally" by Gonzales; she also argued that admission of the statement would violate Chumacero's

---

[10] These videos contained witness statements regarding the shooting itself; they did not directly pertain to Chumacero's video-recorded confession.

constitutional right against compelled self-incrimination. The following colloquy then occurred:

> [Prosecutor]: Your Honor, first the State would adopt the same or similar argument that was made at the previous hearing. It's the exact same issues that have been presented today.
>
> To paraphrase that she's referring to 38.23 of the Code of Criminal Procedure. So in order to understand the intent of a statute we have to understand the purpose of the Code of Criminal Procedure.
>
> So Article [1.03] of the Code of Criminal Procedure indicates that the Code of Criminal Procedure is to be interpreted "to ensure a trial with as little delay as possible and to bring to the investigation of each offense on trial all the evidence tending to produce convictions or acquittal."
>
> The objective of the Code of Criminal Procedure is [to] bring all the evidence to a jury so that they can decide guilt or innocence. And what she's asking for is a suppression of basically two statements, which is contradictory to the intent of the Code of Criminal Procedure.
>
> Article 38.23 says that, "No evidence that's gathered in violation of any law shall be used against the Defendant in a criminal case."
>
> And it's referring to evidence that is gathered against the law by law enforcement, and then it says "other person." "Other person" has been interpreted to mean agent for the State; any person that is not law enforcement that's acting as an agent for the State would be referred to—would be referred to—that's what they're referring to in 38.23.
>
> There is no evidence before the Court that [Gonzales] was acting as an agent for the State or any individual was acting as an agent for the State in securing the statement that the defense attorney hopes to have suppressed.
>
> Also, there is no separate or independent evidence

24

from any source that corroborates the Defendant's claim that Henry Gonzale[s] or somebody else had threatened him to such a degree that the duress overcame his free[ ]will. At most we have a story that the Defendant now is presenting to the Court, but had not presented in 2019 to anybody, had not presented in 2020 to anybody.

If he felt that his family was at risk at the point where that statement comes out and he is basically accepting all responsibility, then there would be no reason for Henry Gonzale[s] or anybody making a threat to take him out, take the family members out, and the only statement that would be available would be that that was already tendered by the defense counsel.

So to argue that there is evidence of duress that would overcome his free[ ]will, number one, there is no evidence of that; number two, the duress wouldn't have been attributed to any law enforcement, and we once again assert that the Defendant's motion to suppress should be denied.

[Defense counsel]: Your Honor, I can submit case law for the Court. I can email [the prosecutor] and the Court the case law that supports the arguments to 38.23. It applies to non[-]law enforcement, other persons. And there is plenty of cases from the Texas Supreme Court.

THE COURT: Well, I'm familiar with that. This is not the first time I've had this issue, so I'm somewhat familiar with the case law in that regard and I'm going to deny the motion to suppress on that basis.

Obviously that will give you an appellate point if you so desire to deal with that.

**4.    Analysis**

It is undisputed that Chumacero's recorded confession was not the result of a custodial interrogation or of police misconduct or overreaching. Therefore, even if it was involuntarily made, the statement could not have been suppressed under the Due Process Clause, *Miranda*, or §§ 2 or 3 of article 38.22. *See Oursbourn*, 259 S.W.3d at

169–71. Instead, article 38.22, § 6 provides the only "theory of voluntariness" applicable to the case. *See id.*

Chumacero argues that, in denying his motions to suppress, the trial judges did not consider whether his statement was voluntary, as required by § 6, because they mistakenly believed that a statement must be the product of custodial interrogation or police overreach in order for it to be suppressed under either the statute or the constitution.

As of the time this appeal was submitted for decision, the trial court had not issued findings of fact and conclusions of law concerning the reasons for the denial of Chumacero's motions to suppress. Accordingly, we abated the appeal and remanded to the trial court for entry of such findings. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Vasquez*, 411 S.W.3d at 920 ("[W]ritten findings are required in all cases concerning voluntariness."). We specifically ordered the trial court to render an order stating whether the denial of the motions to suppress was based on a finding that Chumacero's confession was voluntarily made or was rather based on some other legal rationale. The visiting judge who presided over the second suppression hearing on August 16, 2021— at which Chumacero testified regarding his recorded confession—issued findings of fact and conclusions of law on August 29, 2023. Therefore, we hereby reinstate the case.

The findings and conclusions state in pertinent part:

1.  The court reviewed the 47 second video recording of Chumacero's statement that was recorded by Gonzalez.

2.  There is no evidence of duress, threats, or coercion shown on the video.

3.  Thus, this court finds that there is nothing reflected in Chumacero's video-recorded statement that supports Chumacero's argument that his confession was not freely and voluntarily given.

26

4. The only evidence of involuntariness is the testimony of Chumacero given almost two years later at the August 16, 2021 hearing on the motions to suppress.

. . . .

6. The trial court finds Chumacero's testimony—that his recorded confession was coerced by threats from Gonzalez—to be not credible.

. . . .

16. This court denied Chumacero's motions to suppress based on his claim that his video statement was a false confession elicited as a result of threats from Henry Gonzalez because this court did not find Chumacero's August 16, 2021 testimony—that Gonzalez had threatened to kill Chumacero and his family—to be truthful and credible.

17. Thus, because the video-recorded confession given by Chumacero appeared on its face to have been freely and voluntarily made, and because this court did not find Chumacero's testimony at the motions to suppress hearing to be credible, this court denied Chumacero's motions to suppress.

According to the visiting judge's findings of fact and conclusions of law, its finding that Gonzalez did not coerce Chumacero into making the recorded confession was based on its evaluation of Chumacero's credibility at the second suppression hearing. We must afford "almost total deference" to this finding because it is based on an evaluation of credibility and is supported by the record. *See Ex parte Moore*, 395 S.W.3d at 158; *Abney*, 394 S.W.3d at 547. Deferring to this finding, as we must, we cannot conclude that the trial court erred in denying the motions to suppress. Accordingly, Chumacero's second issue is overruled.

### III.    CONCLUSION

The trial court's judgments are affirmed.

DORI CONTRERAS
Chief Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
28th day of September, 2023.